UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

UNITED STATES OF AMERICA,                )
                                         )
          Plaintiff,                     )          No. 6:17-CR-25-REW
                                         )
v.                                       )
                                         )          OPINION & ORDER
LARRY KARR,                              )
                                         )
          Defendant.                     )

                         ***  ***  ***  ***

Defendant Karr, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), moves for a reduction in sentence,

effectively, a "compassionate release[.]" DE 612 (Motion); *see* DE 612-1 (Mem. in Support). The

Government responded in opposition. DE 616 (Response). Defendant replied. DE 624 (Reply).[1]

The Court, on full review, under the applicable standards, and for the following reasons, **GRANTS**

DE 612 **IN PART**. Karr's Stage IV lung cancer is an advanced, terminal illness. He has served a

weighty fraction of his overall term, and the circumstances justify a compassionate release under

strict terms and diligent USPO oversight.

---

[1] The Court, on review of the initial briefing, ordered several record supplements. *See* DE 628, 630–31 (Orders). Consequently, the full record now includes a copy of the Warden's initial referral of Karr's release request (DE 629-1); Karr's proposed release plan and an addendum to USPO's, DE 624-2, approval of same (this Opinion directs filing of both documents, already circulated to the parties per DE 630); status reports from both parties (DE 632 & 636); and the latest (as of 2/5/20) information concerning Karr's health. *See* DE 634-1 (Karr BOP Health Services records for 1/17–2/5/20); DE 636-2 (Karr email dated 2/5/20).

## I. BACKGROUND

Before turning to the merits of Karr's motion, some history:

– **January 25, 2018**: The Grand Jury returned a Superseding Indictment (DE 46) charging Karr[2] with conspiring, from January 2009 through August 2, 2017, to illicitly distribute oxycodone and oxymorphone, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) & 846 (Count 1); and with knowingly and intentionally distributing oxycodone on December 4, 2017, (Count 2) and December 11, 2017, (Count 3) in violation of 21 U.S.C. § 841(a)(1). *See* DE 46 at 1–2.[3]

– **February 7, 2018**: Karr made his initial appearance, was arraigned, and detained. *See* DE 79.

– **February 20, 2018**: Based on the results of a "CT-guided biopsy[,]" Defendant was diagnosed with lung cancer. DE 238-1 at 10; *see id.* at 9 ("Diagnosed 2/20/2018").[4]

– **May 17, 2018**: The Court accepted Judge Ingram's Recommendation (DE 154) to accept Karr's plea and adjudged him guilty of Count 1 of the operative indictment. *See* DE 157 (Order). As part of his plea agreement, Karr conceded that his participation in the conspiracy extended from January 2013 through "at least August 2017[.]" *See* DE 151 (Plea Agreement).

– **June 25, 2018**: Karr began "chemoradiotherapy" recommended by Dr. William Richards following a "cardiothoracic surgery" evaluation that deemed Defendant "not to be a surgical

---

[2] Age 73 at the close of the charged conspiracy period. *See* DE 627 (PIR) at 2.

[3] The charged conduct allegedly occurred in Bell, Knox, Laurel, McCreary, and Whitley Counties in this District (and elsewhere). *See id.*

[4] Per the record, a 2013 "PET/CT" scan showed that Karr had a "right lung mass[.]" DE 238-1 at 2. That mass measured only 15 mm. *See id.* However, Karr reported that his "primary care physician" advised that the mass was not (then) malignant. *Id.* at 9. Although the document reciting Karr's report describes Defendant as a "poor historian," *id.*, the remaining records track Karr's recollection of the 2013 events. *Cf. id.* at 2. Particularly—and perhaps, for present purposes, most importantly—the records uniformly indicate that Karr was not diagnosed with cancer, and did not begin treatment, until after the charged 2017 criminal conduct. Indeed, that happened only after Karr entered federal custody. *See, e.g., id.* at 7, 9; DE 618-2 at 2 ("Mr. Karr carries a diagnosis of recurrent stage IV squamous cell carcinoma of his right lung. He was first diagnosed in 2018.").

candidate." DE 238-1 at 11–12 (history & recommended course); *id.* at 7–8 ("post-radiotherapy follow-up visit"). Karr's cancer, as of June 30, 2018, was reported as stage IIIA.

– **October 22, 2018**: Dr. Azeem Niazi—though noting difficulty in estimating any overall prognosis due to unavailability of "definitive [surgical] treatment" for Karr's cancer (then-described as "at least stage IIB")—opined: "Follow-up scans after concurrent chemotherapy and radiation did reveal[ ] improvement but with residual disease[.] . . . Overall survival with a definitive treatment 40-50% for next 5 years." DE 238-1 at 5.[5]

– **November 1, 2018**: The Court—recognizing Defendant's "concerning prognosis[,]" but noting, *inter alia*, that Karr was "currently stable, and . . . positively responded to recent treatment" (DE 243 – Minute Entry Order)—denied the defense's motion for a downward departure based on Karr's physical condition and sentenced Defendant to 108 months imprisonment. *See* DE 244 (Judgment).[6] This was, though, a variance. Per Bureau of Prisons (BOP) records, soon after sentencing, Karr's diagnosis progressed from stage IIB to "stage IV lung cancer." DE 612-7 at 36 (noting transfer in "November 2018 for stage IV lung cancer treatment"). **June 4, 2019**: BOP medical personnel reported that Karr's condition is terminal and estimated his life expectancy at 12 months. DE 612-3 at 3.

– **June 14, 2019**: Acting FCC Butner Warden A.W. Rupska recommended "consideration" of Karr's "Reduction in Sentence" request. DE 629-1 at 2. [Karr represents filing his request in "early 2019." DE 612-1 at 9.]

---

[5] The referenced improvement evidently motivated a reduced diagnosis, from stage IIIA to "stage IIB" on September 24, 2018. DE 238-1 at 1.

[6] For the trafficking conspiracy conviction, Karr (based on an offense level 30 and a criminal history category of 3) faced an unchallenged Guidelines range of 121–151 months, and (given his prior state trafficking conviction) a statutory maximum of 30 years imprisonment. *See* PIR at ¶¶ 102–103; DE 117 (§ 851 Notice); 21 U.S.C § 841(b)(1). No mandatory minimum pertained.

- **October 30, 2019**: BOP Assistant Director/General Counsel Ken Hyle issued a decision denying Karr's request for compassionate release. DE 612-2 at 2–3.[7] The Bureau found that "although [Karr met] the criteria for a [reduction in sentence or 'RIS'] under" BOP Program Statement (PS) 5050.50 § 3(a),[8] "approval of Mr. Karr's request for a RIS would be inappropriate." DE 612-2 at 3. The BOP cited 3 factors in support of this conclusion: (1) "Mr. Karr's diagnosis was known by the court at the time of sentencing;" (2) "his medical conditions did not prevent him from committing his offenses;" and (3) "his current independence with his [activities of daily living] will not prevent him from reoffending." *Id.*

- **December 2019**: After a July 2019 CT scan that showed "stable mediastinal" disease, a follow-up scan showed an "increase in size of [the] mediastinal disease," and "stable liver lesions." DE 634-1 at 6.[9]

- **January 8, 2020**: Karr filed the instant motion. DE 612.

---

[7] In the context of applicable BOP regulations, the Warden's recommendation was in favor of the reduction. The scheme is binary—*i.e.*, there is either a "recommendation" under 28 C.F.R. § 571.62 or a "denial" under § 571.63. The referral for consideration happens only when the relevant warden, after "investigation[,] . . . determines that the request warrants approval[.]" 28 C.F.R. § 571.62(a)(1).

[8] This section, in relevant part, provides:

> RIS consideration may be given to inmates who have been diagnosed with a terminal, incurable disease and whose life expectancy is eighteen (18) months or less, and/or has a disease or condition with an end-of-life trajectory under 18 USC § 3582(d)(1). The BOP's consideration should include assessment of the primary (terminal) disease, prognosis, impact of other serious medical conditions of the inmate, and degree of functional impairment (if any). Functional impairment (e.g., limitations on activities of daily living such as feeding and dressing oneself) is not required for inmates diagnosed with terminal medical conditions; however, functional impairment may be a factor when considering the inmate's ability or inability to reoffend.

BOP PS 5050.50 § 3(a) (Jan. 17, 2019).

[9] Per the Cleveland Clinic: "Mediastinal tumors are growths that form in the area of the chest that separates the lungs. . . . The mediastinum contains the heart, aorta, esophagus, thymus, trachea, lymph nodes and nerves." DE 636-3 at 2.

- **January 13, 2020**: Dr. Andrew Stock, of BOP, noted that an oncological review of Karr's December 2019 CT scan "showed some progression of [the] disease[,]" and confirmed that Defendant's prognosis "remains poor" with a "life expectancy under 12 months." DE 618-2 at 2.

- **February 3, 2020**: BOP Oncologist Dr. Andres Carden saw Karr to discuss "other treatment regimens including adding Carboplatin and Taxol to [his current cancer medication] Keytruda or switching to a TKI." DE 634-1 at 6. Karr reported shortness of breath and that he was easily fatigued. *Id.*

- **February 5, 2020**: Karr stated, in an email to counsel, that his 9 months of Keytruda treatments "reduced" but did not remove his "difficulties breathing and pain." DE 636-2 at 2. He further reported that, in recent months: (1) Keytruda's beneficial effects have declined, (2) breathing has become "extremely difficult[,]" (3) walking causes the pain in his chest to "become so unbearable" that he has "to sit or lean against the wall before [he is able to] continue on"; and (4) he has "developed a cough . . . so hard that [he] passed out[.]" *Id.*

Based on his well-documented diagnosis of "terminal metastatic" Stage IV cancer,[10] Karr (now nearly 76 years old, *see* PIR at 2) seeks a sentence reduction under § 3582 so "that he can spend his final days with his family and loved ones." DE 612-1 at 5. The matter is briefed. *See* DE 616 & 624.

## II.    EXTRAORDINARY & COMPELLING REASONS

In relevant part, § 3582(c)(1)(A) provides:

> [T]he court . . . may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

---

[10] *See also* DE 612-7 at 8 (noting, on November 4, 2019, "multiple metastatic deposits").

>> (i) extraordinary and compelling reasons warrant such a reduction; . . . .

> and that such a reduction is consistent with applicable policy statements issued by
> the Sentencing Commission;

18 U.S.C. § 3582(c)(1)(A).[11] This is a provision Congress recently broadened (through a direct federal court portal) as part of the First Step Act of 2018, a criminal justice measure passed on December 21, 2018. *See* PL 115-391, 132 Stat 5194.

Congress has explicitly directed the USSC to define "extraordinary and compelling reasons for sentence reduction[.]" 28 U.S.C. § 994(t); *see id.* at (a)(2). The parties agree that Karr qualifies for one such basis, as defined in the Commission's policy statement at Application Note 1(A)(i) to USSG § 1B1.13:[12]

---

[11] This provision also requires the defendant to "fully exhaust[ ] all administrative rights to appeal[.]" *Id.* The Government does not dispute and the record supports Karr's exhaustion claim. *See, e.g.*, DE 612-1 at 9; DE 612-2 (BOP Denial Decision). There is a timing safety valve; if the BOP fails to process a request within 30 days, a petitioner can come straight to court. *See* 18 U.S.C. § 3582(c)(1)(A). Yet, a warden's initial approval presents a quandary for an applicant inmate. Does the prisoner go directly to court as soon as authorized and potentially forgo a BOP-backed request? Or, should the defendant await the uncertain results of a (likely) lengthy administrative process? It took the BOP more than 5 months to process Karr's request. *See* DE 612-1 at 9 (representing an "early 2019" filing); DE 612-3 (June 4, 2019, medical summary concerning compassionate release); DE 629-1 (June 14, 2019, letter recommending approval); DE 612-2 (October 30, 2019, denial letter). That a defendant should face this dilemma in the time-sensitive scenario the statute envisions seems an unfortunate pitfall in the current scheme. Whatever the BOP status, though, the 30-day limit persists.

[12] At least one Court has determined that USSG § 1B1.13 is not, in its current form, a "policy statement applicable to motions for compassionate release filed by defendants under the First Step Act." *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *5 (M.D.N.C. June 28, 2019). Given the Government's concession as to Karr's "extraordinary and compelling" motion basis, the Court need not reach this issue. *See also id.* at *6 (noting that the "policy statement provides helpful guidance"). However, Congress did pass the statute with § 1B1.13 as a backdrop. The Court logically references the extant version of the Policy Statement on compassionate release as an "applicable" policy statement. 18 U.S.C. § 3582(c)(1)(A).

The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

That is, the Government acknowledges that Karr's terminal cancer is a qualifying "extraordinary and compelling" predicate for a sentence reduction. *See* DE 616 at 5 (Karr's cancer "provides a legal basis on which the Court may consider reducing his sentence[.]"). With the predicate established, the Court must address the merits of Karr's reduction request. The Court has discretion to reduce a sentence where the triggering predicate exists, but must analyze all applicable § 3553(a) factors, must determine that the defendant is not a danger (per § 3142(g)), and must find any reduction compliant with applicable Sentencing Commission policy statements.

## III.    REDUCTION PROPRIETY

The United States opposes Karr's reduction request on several grounds. Generally, the Government notes the Court's obligation to consider the § 3553(a) factors and USSC policy, and that the authorizing provisions permit, but do not require a reduction for a qualifying movant. DE 616 at 5. [Notably, the Government is not arguing that releasing Karr would *never* be appropriate; rather, its theory is that the motion is "premature." *Id.* at 7; *see also id.* at 2 ("Karr's motion should be denied without prejudice."); *id.* at 8 ("Karr . . . should not at this time receive a Compassionate Release[.]").] The Court now addresses the Government's three arguments.

A.    Karr's Life Expectancy

The Government first argues that Karr's life expectancy is indeterminate. DE 616 at 6. Section 3582(c)(1)(A) expressly directs the Court to ensure consistency with USSC policy statements on this topic. Commission policy, in turn, provides that for a qualifying "terminal illness" a "specific prognosis of life expectancy . . . is not required." USSG § 1B1.13, comment.

(n.1(A)(i)). Thus, to accept the Government's theory and deny Karr relief based on imprecision in his prognosis would be <u>inconsistent</u> with both USSC policy and, given the congressional directive, the governing statute. The theory, as presented, also makes little logical sense. Consider, the United States acknowledges that it is "[o]bviously . . . impracticable to predict the exact date Karr will die[,]" but suggests that the Court should rely on uncertainty in that same necessarily imprecise forecast to deny relief. DE 616 at 6. The Court wonders how a movant could satisfy the standard the Government poses.

Of course, the doctors here have given specific expectancy estimates. Before sentencing, Karr's doctor gave a 40-50% 5-year survival rate. Relative to this motion, however, the BOP doctors estimated 12 months in June of 2019 and "under" 12 months in January 2020. Tomorrow is promised to no one, but these are concrete mortality estimates built on the verified Stage IV squamous cell carcinoma diagnosis. Further, as a factual matter, the Court disagrees that "it is clear[,]" on this record, "that the date or date range" that Karr's doctors estimate "continues to move." *Id.* In June 2019, "Dr. Carden determined" that Karr's life expectancy was "12 months." DE 612-3 at 3. In January 2020, Dr. Stock opined that Karr's life expectancy was "**under** 12 months." DE 618-2 at 2 (emphasis added). Given temporal context, the two predictions are entirely consistent—unless, that is, the reader demands the type of precision that the Government deems "[o]bviously . . . impracticable[.]" DE 616 at 6.

B. <u>Quality of Life Diminishment</u>

The United States next argues that Karr is not yet suffering from any significant deterioration in his quality of life. DE 616 at 6–7. The Government does not specify any particular inference to draw from this claim. However, it seems most likely that the United States is obliquely contending that Defendant's continued ability to ambulate (with an "assistive device for support")

or his failure to lodge subjective complaints of "acute distress" are relevant Karr characteristics for purposes of § 3553(a)(1). DE 616 at 6; *see id.* at 7 (referencing Karr's "health at the time he committed the offense" and "his current medical condition").[13] The Court sees little persuasive impact for present purposes. First, the Court notes that Karr was not diagnosed with cancer until **after** the charged conspiracy period. Thus, the record does not offer any detail as to Karr's health during his crime, against which the Court could measure his current physical ability. Second, and though the Court noted (at sentencing) that Karr's crime required "no physical exertion[,]" DE 243, Karr's disease has, post-sentencing, significantly progressed and his prognosis has sharply worsened. Third, the Government does not argue, in any detail, that Karr is still dangerous or that his persisting physical abilities would allow him to reoffend. Ultimately, the Court finds the fact that Karr has maintained, while rapidly approaching death's door, the "ability to attend to many of his activities of daily living within the prison setting" not disqualifying. DE 616 at 7.[14]

C. Section 3553(a)

The Government's remaining arguments fall under the § 3553(a) umbrella. *See* DE 616 at 7–9. The United States summarizes Karr's indisputably serious criminal conduct, notes Karr's

---

[13] Alternatively, if the theory is that Karr's continued functional capacity renders his cancer somehow less "extraordinary" or "compelling," the law is otherwise. Per Application Note 2(A)(ii), certain serious, **non-terminal** conditions may qualify as extraordinary and compelling, but only if such an impairment "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG § 1B1.13, comment. (n.1(A)(ii)). The final clause of this caveat (as well as the structure of the commentary) makes clear that the "substantially diminishes" requirement does not apply to a "terminal illness" predicate, which is inherently a condition without expectation of recovery. *Compare id.*, *with* USSG § 1B1.13, comment. (n.1(A)(i)). Thus, per the Commission, a terminal illness is a distinct "extraordinary and compelling" qualifier that stands independent of any instant impact on functional capacity.

[14] The Sentencing Commission's decision to omit consideration of this factor for defendants, like Karr, facing terminal diagnoses reinforces the weight assigned this information. *Compare* USSG § 1B1.13, comment. (n.1(A)(i)), *with* USSG § 1B1.13, comment. (n.1(A)(ii)); *see also supra* note 9.

persisting abilities, and generally claims that granting Karr's motion "would be contrary to the purposes of sentencing[.]" DE 616 at 7. Specifically, per the Government, a reduced sentence for Karr would not, in the circumstances, reflect crime gravity, promote respect for the law, afford (specific and general) deterrence, or provide just punishment. *Id.* at 7–8. The Court, after careful consideration of these weighty needs, disagrees.

At the outset, the Court notes Congress's apparent recognition that § 3553(a) analysis in the § 3582(c)(1)(A) context differs from initial sentencing consideration. Section 3582 directs § 3553(a) analysis only "to the extent [the factors] are applicable[.]" This makes sense in an "extraordinary and compelling" scenario occurring after the original sentencing. Given Congressional reference to the remedy as "compassionate release" in this context,[15] the impact of a defendant's initial "sentencing range" is surely diminished. 18 U.S.C. § 3553(a)(4). Further, the biologically likely span remaining to a defendant is, to this Court, logically relevant to the § 3553(a) sufficiency of a given sentence.[16] Put differently, at least when confronting a terminal case, the Court finds it fair to consider—in plumbing what is enough, but not more than enough— the relative portion of a defendant's remaining life that a sentence will take. A terminal diagnosis is, thus, a highly relevant "characteristic" that provides an overlay for the Court's evaluation of the pertinent factors.

As to Karr specifically, the Court begins at the end of its initial § 3553(a) weighing. Under then-existing circumstances, the Court found that 108 months parsimoniously accounted for the applicable sentencing factors and purposes. So, what has changed since that time?

---

[15] Pub. L. 115-391, Title VI § 603(b), 132 Stat. 5194 (Dec. 21, 2018) (captioned "Increasing the use and transparency of compassionate release").

[16] The Court notes for comparison that the Guidelines provide for a presumptive "life" term only for the gravest (by offense level measurement) crimes. *See* USSG § 5A (Sentencing Table).

*History & Characteristics*

*First*—Karr's diagnosis has deteriorated—from Stage II/III cancer (of the right lung) responding positively to treatment, to a metastasized Stage IV disease. *Compare* DE 238-1 at 5, *with* DE 618-2; *see also* DE 612-7 at 8 ("multiple metastatic deposits"). His estimated life expectancy has significantly diminished—from a projected, indeed hopeful 40-50% survival rate for a 5-year period to "under 12 months." *Compare* DE 238-1 at 5, *with* DE 618-2. The cancer in Karr's mediastinum—an area that includes the heart and aorta, among other critical structures (*see* DE 636-3 at 2)—is, despite treatment, growing. *See* DE 636-1 at 2.

*Second*—Karr (detained since his February 7, 2018, arrest) has now served two full years in federal custody. *See* DE 77 (Arrest Warrant).[17] During all but the first month, Karr has served his time with a cancer diagnosis and, since June 2018, faced the side-effects of treatment behind bars. *See* DE 238-1 at 7–8. Thus, Karr's time has surely been "significantly more laborious than that served by most inmates." *United States v. McGraw*, No. 2:02-cr-00018-LJM-CMM, 2019 WL 2059488, at *5 (S.D. Ind. May 9, 2019). The Guidelines provide that an "extraordinary physical impairment may be a reason to depart downward[.]" USSG § 5H1.4. By the Commission's standards, Karr's cancer is not only an extraordinary impairment, but also a compelling reason to reduce his sentence. Each day lasts 24 hours, but each day's toll is not the same. Terminal cancer in custody is a characteristic of weight in measuring Karr's sentence to date. *See, e.g.*, DE 618-3 at 3 (reporting "blackouts"); *id.* at 17 ("treatment the 2nd week is accompanied with pain"); *id.* at 20 ("severe pain"); DE 612-7 at 24 ("rash on ankles . . . since starting Keytruda regime").

---

[17] The parties repeatedly miss this point. Karr went into federal custody in this case on February 7, 2018. He stayed in custody through the resolution of the case. He gets credit for (and has spent each day in federal custody during) the full intervening two years. This almost doubles the parties' 13-month metric.

*Deterrence*

The Court, as to deterrence need, finds it critical to reiterate that Karr committed his crime **before** the cancer diagnosis. Had Karr, with full knowledge that his time was short, embarked on a criminal enterprise, the need for specific and general deterrence would likely dissuade the Court from entertaining this request. It would be difficult to overstate the importance of this distinction. There are good reasons for deterring an individual from engaging in criminal conduct knowing full well that the likely consequence will be imprisonment for the remainder of his or her life. But, Karr's is not a case of "Breaking Bad." *See Breaking Bad: Pilot* (AMC television broadcast Jan. 20, 2008).

Karr has spent his entire post-diagnosis life incarcerated and, per his doctors, can expect to measure his remaining time (free or not) in months. The Court finds that a reduction would not leave Karr inadequately deterred. As to general deterrence, the Court sees no material risk of future criminality in a reduction based on a post-crime, terminal diagnosis (an extraordinary event) for individuals who, by analogy, would not and could not predict the availability of relief on the ground Karr now presses.

*Danger*

As to danger, the Court notes that the Government does not pin its opposition on alleged danger. Under the Application Notes, the Commission conditions a finding of "extraordinary and compelling reasons" on a determination that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" USSG § 1B1.13(2); *see id.* at comment. (n.1) (predicating the existence of "extraordinary and compelling circumstances" on satisfaction of "the requirements of subdivision (2)[.]"). This strikes the Court as an odd construction because the Policy Statement itself treats whether a condition is extraordinary and

compelling as a question distinct from whether a defendant is yet a danger. The Court believes it must independently determine both, as the statute suggests and the Policy Statement requires, so the Court assesses danger. Karr, trying to earn release and change the status quo, properly has the burden on the propriety of release. *See United States v. Israel*, No. 05 CR 1039 (CM), 2019 WL 6702522, at *9 (S.D.N.Y. Dec. 9, 2019); *Cannon v. United States*, No. CR 11-048-CG-M, 2019 WL 5580233, at *2 (S.D. Ala. Oct. 29, 2019); *cf. United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) ("And a defendant, as the § 3582(c)(2) movant, bears the burden[.]").

The phrasing in the Policy Statement invokes release principles from the Bail Reform Act, particularly § 3142(g). That is, the Court here must determine whether Karr "is [ ] a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" USSG § 1B1.13(3). In the (g) context, a court evaluates "whether there are conditions of release that will reasonably assure . . . the safety of any other person and the community[.]" 18 U.S.C. § 3142(g). In making the determination, a court weighs 1) offense nature; 2) weight of the evidence against the person; 3) particular history and characteristics; and, perhaps most aptly, 4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. *Id.* The Court views the Commission's cross-reference to (g) as an invocation of the exercise (g) requires: Would release conditions the Court could impose, as part of a reduction in sentence, reasonably eliminate danger? Courts have followed this approach.[18]

---

[18] *See, e.g.*, *United States v. Schmitt*, No. CR12-4076-LTS, 2020 WL 96904, at *5 (N.D. Iowa Jan. 8, 2020); *United States v. Spears*, No. 3:98-CR-0208-SI-22, 2019 WL 5190877, at *5 (D. Or. Oct. 15, 2019); *United States v. Bellamy*, No. CV151658JRTLIB, 2019 WL 3340699, at *6 (D. Minn. July 25, 2019); *United States v. Wong Chi Fai*, No. 93-CR-1340 (RJD), 2019 WL 3428504, at *3 (E.D.N.Y. July 30, 2019); *Beck*, 2019 WL 2716505, at *11; *United States v. Johns*, No. CR 91-392-TUC-CKJ, 2019 WL 2646663, at *3 (D. Ariz. June 27, 2019); *McGraw*, 2019 WL 2059488, at *5.

The Court knows well and has surveyed the full record. Karr pleaded guilty to serious, Class B drug trafficking. He was a conspiracy leader; the crime was long-term and lucrative.[19] Karr's record showed drug-related (though not opiate) recidivism. These things contributed to the significant sentence the Court imposed in November of 2018. As the Court noted at the time, Karr was at an advanced age when he committed the crime, and the crime was one requiring only communication, cash, and contact. This meant and means that such a crime does not require much in the way of physical capacity.

However, things have changed in important ways. The cancer will soon take Karr's life; it already has taken his free ambulation. *See* DE 612-3 at 5. BOP records show him as assisted with a walker[20] and compromised in handling his own inmate account. DE 618-3 at 17; DE 612-3 at 6.[21] Karr has accumulated a clean record while in, with no known violations in the jail or at the BOP. *See* DE 629-1 at 2.

---

[19] Although, there is no indication that Karr's financial situation is anything but indigent. *See, e.g.*, PIR at ¶ 100 (calculating Karr's net worth as *negative* $42,331.24); DE 629-1 (As of June 14, 2019, Karr, though participating in the BOP's Inmate Financial Responsibility Program, still owed the 2018-imposed $100.00 felony assessment.); *see also* 28 C.F.R. § 545.11(b) (Under the IFRP, inmates are generally "expected to allot not less than 50%" of their monthly income in excess of $75.); Release Plan at 3 (reflecting a $25 payment towards the assessment on 5/10/19). [The Court Ordered circulation of the release plan along with a USPO addendum to the filed approval letter. *See* DE 630. The Court, to ensure a complete record, attaches that addendum and the (redacted) plan for docketing.]

[20] The Government notes that January 24, 2019, records depict Karr as "ambulatory without the need for an assistive device." DE 634-1 at 11. Thus, Karr evidently does not **always** use a walker. Nonetheless, the proof regarding reduced ambulatory ability is strong. *See, e.g.*, *id.* at 6 (""Easily Tired, Fatigue"); DE 636-1 at 2 (reporting, on 12/13/19, "generalized" pain at a level 7/10 for 1-5 hours at a time that is exacerbated by "movement and exertion"); *id.* ("He continues to have shortness of breath."); DE 636-2 (Karr email stating that walking causes the pain in his chest to "become so unbearable" that he has "to sit or lean against the wall before [he is able to] continue on").

[21] BOP also deemed Karr's condition sufficiently severe to withhold any work assignment. *See* Release Plan at 2.

Several things give the Court pause. Karr's crime involved at least some of his family members and those close to him. *See* PIR at ¶¶ 17–36. As such, while strong family support generally is a positive, a family that foments or participates in crime is no plus. Further, Karr has a record of crime while on supervision. This dates back to his first and second marijuana crimes. *See id.* at ¶¶ 58 & 59. Karr was on parole when he engaged in the Class B trafficking that has him at the BOP. *See id.* at ¶ 63.

On the other hand, Karr's record has notable elements that are positive. No crime until his mid-50s. *See id.* at ¶ 55. Only one act of violence, from 20 years ago. *Id.* at ¶ 56. He is not a drug abuser. *Id.* at ¶ 89. Further, Karr took immediate and full responsibility for his crime, accepting punishment while others sought to avoid accountability. His record in prison and supportive letters from family, friends, and fellow inmates depict a man intent on staying within proper limits as his life nears an end. *See* DE 612-5 & 203 (Letters).[22]

The Court expects that the terminal diagnosis and advancing cancer would have a positive, clarifying effect on Karr. Whether that is so or not, the disease undoubtedly dilutes any danger Karr might otherwise pose. He faces mobility and other worsening consequences, to include recent reported blackouts and intermittent "unbearable" pain. DE 636-2 at 2;[23] *see* DE 618-3 at 3. He

---

[22] Statistics too suggest decreased recidivism risk in this scenario. *See Beck*, 2019 WL 2716505, at *11 n.13–14 and accompanying text ("Sentencing Commission studies suggest that retroactive sentence reductions do not increase recidivism rates and that recidivism is extremely rare among inmates who qualify for BOP's compassionate release program.") (citing *Recidivism Among Federal Offenders Receiving Retroactive Sentence Reductions: The 2011 Fair Sentencing Act Guideline Amendment,* Mar. 2018, *available at* https://www.ussc.gov/sites/default/files/pdf/ research-and-publications/research-publications/2018/20180328_Recidivism_FSA-Retroactivity .pdf; *The Federal Bureau of Prisons' Compassionate Release Program*, Apr. 2013, *available at* https://oig.justice.gov/reports/2013/e1306.pdf).

[23] The Court, in context, finds Karr's recent pain and symptomatic reports particularly credible. The record offers no reason to doubt his verity on this topic. When Karr has felt well (or improved), he has reported as much. *See, e.g.*, DE 634-1 at 9 ("I'm doing alright"); *id.* at 11 ("has a bad cold,

walks with a rolling walker. *Id.* at 17. Further, to repeat his crime would require interactive abilities that the Court believes it can reasonably manage through a web of overlapping restrictions.[24] Those restrictions will, in essence, transfer Karr's confinement from the BOP to his daughter's home, with otherwise comparable limits on contact and movement.[25] The rules will prevent outside contact, regulate and monitor movement, assure pervasive USPO oversight, account for prescriptions, and circumscribe all conduct that could allow further criminality.

*Crime Gravity, Respect for the Law, and Just Punishment*

The Court, in the circumstances, finds that a reduced sentence for Karr would still adequately reflect crime gravity, cultivate and show proper respect for the law, and amount to just punishment. Karr, of the five Defendants charged in DE 46 and ultimately convicted, was the sole Defendant to accept responsibility for his crimes. Even if immediately released, Karr will likely have spent the vast majority of the period from his August 2, 2017, crime through the end of his life in federal custody. A grave crime, like Karr's, warrants a grave punishment. But even the Government does not suggest that "life" imprisonment is warranted.

Again, the United States argues only that Karr should not "**at this time** receive a Compassionate Release." DE 616 at 8. Yet, the Court is left to wonder, "if not now, when?"[26] Given the Government's other theories, perhaps the ask is for the Court to wait until Karr cannot

---

but he thinks he is getting better"); DE 615-1 at 6 ("I'm good"). He does not seem to understate or overstate symptoms.
[24] The Court notes that the Guidelines also recognize that home detention may be a suitable and more efficient result than incarceration, in the extraordinary case, *e.g.*, for a "seriously infirm" defendant. USSG § 5H1.4.
[25] The Court agrees that the dismantling of the conspiracy impacts danger. Oxycodone trafficking in the District has declined, but not disappeared. The restrictions to be imposed would effectively eliminate any residual danger Karr poses.
[26] Hillel the Elder, *Pirkei Avot 1:14* (Dr. Joshua Kulp trans. 2013).

even "mov[e] short distances about the institution[,]" or bathe and feed himself. DE 616 at 7.[27]

Yet, the prosecution does not explain how the Court could predict how far in advance (if at all) of Karr's death his physical abilities will diminish to that extent. Further, given the need for administrative exhaustion[28] (or a 30-day post-request, pre-filing period), the need for briefing, time for the Court's evaluation, and experts' life-expectancy estimates, it is hardly clear that a "without prejudice" denial of Karr's motion would leave him any meaningful opportunity to renew the request.

The Court has wrestled with the § 3553(a) factors. In essence, the § 3582 gateway calls for careful remeasuring, to the extent the factors yet apply, given the changed circumstances. Karr's characteristics are different, compellingly so, now. His crime, though, is the same. The Court perceives the factors as important limits on compassionate release. It may be, in many cases, that crime gravity, the need for just punishment, the need to promote respect for the law, or danger

---

[27] The Government contends that a reduction for Karr would be "the ultimate insult to . . . the victims of his crimes." *Id.* at 8. [Again, Karr, in this Court, was convicted of only one crime.] The Court has no doubt that Karr's crime victimized many. Oxycodone (despite any potential as a legitimate medication) is, when distributed illicitly, poison and (as the trial of Karr's co-conspirators made clear) a reaver of communities. That said, the United States, at sentencing, did not identify any alleged Karr victims or provide any impact statements. *See, e.g.*, DE 460 (Sentencing Tr.) at 4. Further, § 3553(a) explicitly tasks the Court with considering victim impact in the restitution context. *See* 18 U.S.C. § 3553(a)(7). The Government (despite pursuing and receiving a $537,330.00 forfeiture money judgment, *see, e.g.*, DE 158) did not request restitution for any victims. *See also* PIR at ¶ 39 ("[T]here is no method which could be used to identify specific victims or the loss they incurred as a result of this criminal activity."); *id.* at p. 25 (addendum reporting no Government objections). This history significantly (if not fatally) enervates the current argument. Again, and to be clear, the Court is not suggesting that Karr committed a victimless crime. Rather, the Court finds unpersuasive the Government's rhetorical reliance on its estimation of how unidentified victims might view Karr's request.

[28] *See* DE 612-1 at 9 (claiming a 6-month, May to October 2019, gap from Warden approval to BOP denial).

would prevent release even for a defendant otherwise meeting the § 3582 and § 1B1.13 criteria. Death in prison is a reality, and not every person that could be released should or will be released.[29]

Karr's serious offense drew a serious term, one that justly punished him in context and one that promoted respect for the law. The sentence accounted for protection and deterrence.

A reduced term here, given the extraordinary interim health developments, still adequately serves those purposes. Again, Karr began his custodial period two years ago. His good-time release date would be December 10, 2025, (*see* Release Plan at 2) and 85% of the original term would be 92 months. Thus, by any measure, he has served over 25% of his total term. For each of those days, Karr has been under a terminal cancer diagnosis, and he began active treatment in July of 2018. Thus, he has endured the physical toll and mental trials of cancer while in custody. He has paid a significant price for his crime. As already noted, the Court can account for community protection and specific deterrence through proper oversight rules. A reduction continues to promote respect for the law.[30] The Court bolsters this finding through the planned mechanics of oversight, via a substitutionary term of probation blanketing the full unserved prison term. That

---

[29] Karr's reply phrases release as an entitlement. *See* DE 624 at 2 (describing release as "relief to which [Karr] is entitled"). That surely is not so. The Court has discretion to but is not obliged to release Karr. Further, the Court rejects the contention that Karr's diagnosis alone is "dispositive" on release, or that the Government's many legitimate concerns are "irrelevant[.]" *Id.* The Court has struggled with the proper release calculus, not advanced by a facile or conclusory approach to the result. For many defendants, the § 3553 calculus will preclude relief.

[30] And this means the whole law, which includes the full sentencing scheme. That scheme features compassionate release, where warranted.

period not only assures safety and continued punishment, it also leaves the potential for revocation and resentencing as concrete deterrents against misconduct.[31]

*Other Factors*

The Court finds Acting Warden Rupska's initial recommendation for approval[32] of Karr's release request a telling factor for at least two reasons. First, the BOP's ultimate rejection of the Warden's preliminary endorsement turned, in part, on an erroneous (or, at least, incomplete) understanding of the record. For starters, though the Court was aware of "Karr's diagnosis of lung cancer" at sentencing, Defendant's diagnosis and prognosis have, since then, markedly changed for the worse. DE 612-2 at 3. Additionally, Karr's conditions, if then-present, were undiagnosed at the time of his *offense*. Thus, the record is hardly clear that "his medical conditions did not prevent him from committing his offenses" (Karr, in this Court, was convicted of only one offense). *Id.* at 3. Given the Warden's initial sign-off, it seems, as a fair inference, that absent these misapprehensions, the BOP (*i.e.*, the Executive Branch) would have itself pursued the reduction that Karr now requests (and the United States, here, opposes).[33]

---

[31] To the extent disparity is relevant in this context, and the Government does not oppose the request on that basis, Defendant's briefing provides ample citation to caselaw authorizing reductions in analogous (or, in some ways, less compelling) circumstances. *See, e.g.*, *United States v. Gasich*, No. 2:14-CR-63, 2019 WL 4261614, at *1 (N.D. Ind. Sept. 9, 2019) (granting release motion after Defendant served less than 2 months of a 36-month sentence); *United States v. Wong Chi Fai*, No. 93-CR-1340 (RJD), 2019 WL 3428504, at *4 (E.D.N.Y. July 30, 2019) (releasing Defendant sentenced to **life** imprisonment based on "metastatic papillary thyroid cancer" diagnosis); *United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *5 (S.D. Tex. June 17, 2019) (finding "extraordinary and compelling" the Government's non-opposition to Defendant's service of "the rest of his term of imprisonment in home confinement").

[32] *See* DE 629-1 at 2. The Court has already explained why the Warden's recommendation for consideration was, effectively, a recommendation for approval. *See supra* note 6; *see also* 28 C.F.R. § 571.62(a)(1) (directing a recommendation after an investigation and a determination "that the request warrants approval").

[33] In that scenario, the Court would have been able to consider the relief now sought under the pre-First Step Act § 3582(c)(1)(A) scheme. *See* Pub. L. 107-273, Div. B, Title III, § 3006, Nov. 2, 2002, 116 Stat. 1806. And, Congress, through the FSA, endeavored to "[**i**]**ncrease** the use . . . of

19

Second, the initial approval suggests some post-sentencing rehabilitation. The Court finds it unlikely that the Warden would have signed off if Karr had been anything less than a model prisoner.[34] Inmate Bobby Justice's letter corroborates this inference. *See* DE 612-5 at 2. Additionally, Karr, despite limited programming due to ongoing medical treatment, completed a 4-month non-residential drug abuse treatment program on May 6, 2019. *See* Release Plan at 2–3. The Supreme Court has described positive post-sentencing conduct as "a critical part of the 'history and characteristics' of a defendant that Congress intended sentencing courts to consider[,]" as shedding "light on the likelihood that [a defendant] will engage in future criminal conduct," and as bearing "directly on [a] District Court's overarching duty to 'impose a sentence sufficient, but not greater than necessary,' to serve the purposes of sentencing." *Pepper v. United States*, 131 S. Ct. 1229, 1242–43 (2011).

<em>The Kinds of Sentences Available</em>

The availability of alternative sentences will further vindicate the sentencing purposes. *See* 18 U.S.C. §§ 3553(a)(3) (directing consideration of "the kinds of sentences available"); 3582(c)(1)(A) (authorizing imposition of "a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment"). Thus, the Court may craft a sensible substitutionary oversight term. On this record, the Court finds that reducing Karr's sentence by shortening his incarceration and imposing a 6-year probation term on restrictive conditions will parsimoniously account for the persisting §

---

compassionate release[.]" Pub. L. 115-391, Title VI § 603(b), 132 Stat. 5194 (Dec. 21, 2018) (emphasis added); *see also Beck*, 2019 WL 2716505, at *6 (The First Step Act's § 3582(c)(1)(A) modifications were "enacted to further increase the use of compassionate release[.]").

[34]Indeed, Warden Rupska explicitly noted that Karr had "not received any incident reports during his current term of incarceration." DE 629-1 at 2; *see also* Release Plan at 2 (same). Further, BOP policy explicitly directs consideration of "[i]nstitutional adjustment" and "[d]isciplinary infractions" in reviewing sentence reduction requests. BOP PS 5050.50 § 7 (Jan. 17, 2019).

3553(a) factors. [The choice of probation (as opposed to supervised release) provides further respect for the gravity of Karr's crime and his past recidivism. In the (what the Court considers) highly unlikely event that Karr reoffends, a sentence of probation leaves the door open to the full panoply of resentencing options.] A proven violation likely would call for a return to the BOP.

The release will be effective March 1, 2020. Karr's disease is confirmed and progressing; his condition is worsening, and, of course, he continues to age. In this specific case, release restrictions can ably serve the § 3553 interests that yet apply. The compassionate release statute does not require that the Court hear the death rattle before acting. This request satisfies the statute and Guidelines, and the Court thus exercises its discretion and gives Karr relief.

Defendant has a USPO-approved release plan that would place him at his daughter's home. *See* DE 624-2 (Approval Letter).[35] The Court, in the initial judgment, established numerous conditions for a Karr supervised release sentence, and found such conditions the minimum necessary to satisfy § 3553(a) needs. *See* DE 244 at 3–5. The Court, in the new circumstances, finds the following conditions enough but not more than enough to account for the extant statutory factors and vindicate the statutory purposes:

(1) All supervision terms set forth in the original Judgment & Commitment Order.

(2) Karr shall be placed on home incarceration for the first twenty-four (24) months of probation with electronic monitoring. During this time, Karr may not leave the four walls of his place of residence, except for activities approved in advance by the probation office. The probation office may approve proper departures only to attend medical appointments, to attend to other medical needs, and for any court hearings. Other than in an emergency requiring 911 transport, Karr must secure approval prior to leaving home during the home incarceration period. Karr shall cooperate in whatever phone or other

---

[35] Karr's persisting, strong family ties (at least as to Darcia Karr) and positive perception from multiple community members (*see*, DE 612-5) additionally contribute to the Court's § 3553(a) conclusion. *See United States v. York*, No. 3:11-CR-76, 2019 WL 3241166, at *7 (E.D. Tenn. July 18, 2019) (noting, as supportive of compassionate release, defendant's release plan "to live with his stepson").

verification system the USPO elects. The home incarceration shall be at the residence of Darcia Karr. The following additional rules apply to the home incarceration:

— Mr. Karr may not have visitors at the home except as approved in advance by the USPO. The visitors may include only family members, clergy, medical providers, and legal counsel. The visitors may not include any person identified in the PIR as having involvement in or a connection to the underlying offense (this includes Charles Swanson and Hazel Darlene McClure). Mr. Karr shall keep, and USPO shall review, a log of all visitors (time/date/purpose of visit).

— Mr. Karr may not use any telephone, cell phone, or electronic device to communicate to any person, except adult household members and others approved in advance by the USPO. For a medical emergency, Karr may contact 911.

— Mr. Karr must make full and ongoing disclosure to USPO of all finances. He may not make cash transactions. Any bills he pays, purchases he makes, or funds he receives must be documented by receipts, which the USPO may inspect.

— Mr. Karr must disclose to USPO each and every medical provider he plans to see or receive treatment from. This includes physicians, pharmacists, and other care providers.

— Mr. Karr may not at any time be in possession, custody, or control of another person's prescription medication.

— Mr. Karr may not use alcohol.

— Mr. Karr must notify any healthcare provider about his federal conviction and his probation status prior to accepting a controlled substance prescription and must direct said provider to cooperate with USPO's efforts to confirm prescriptions, effect prescription controls, and appropriately regulate or oversee Mr. Karr's access.

(3) The home may not contain any controlled substances except with notice to the USPO. If Mr. Karr receives a controlled substance prescription, in addition to all other limitations, USPO shall conduct (and Mr. Karr must submit to) weekly (at least) pill counts on any controlled substance prescriptions to ensure compliance with any prescriber's directions concerning controlled substance use.

## IV.    CONCLUSION

Finding a reduction in sentence warranted, the Court **GRANTS** DE 612 on the following terms:

1. The Court **REDUCES** the term of imprisonment imposed in DE 244 from 108 months to the time served effective **March 1, 2020**;

2. Thus, the BOP **SHALL** release Karr on March 1, 2020;

3. The Government **SHALL** promptly transmit this Court's Order to the BOP;

4. The BOP **SHALL** promptly advise Karr's physicians of his forthcoming release to arrange for necessary accommodations concerning his treatment schedule;

5. Per 18 U.S.C. § 3582(c)(1)(A), the Court **IMPOSES** a probation term, on the conditions stated and those earlier stated in DE 244 at 3–5, of **six years**. This replaces the supervised release term originally imposed; and

6. The Court sets a post-release hearing, to cover expectations, clarify release conditions, and discuss any questions on mechanics, for **March 11, 2020,** at **11:30 a.m.** in London. Counsel for Karr may attend the hearing telephonically, if counsel so desires.

The Court further **DIRECTS** the Clerk to file the attached (lightly) redacted USPO addendum and release plan in the public record and the attached unredacted versions as **sealed** record entries.

This the 18th of February, 2020.

Signed By:

_Robert E. Wier_

**United States District Judge**